# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| MARLENE H. BIXBY, MARTHA ROGERS, WILLIAM NICKLES, and ELEANOR NICKLES, | Civil No. 18-817 (JRT/KMM) |

<table>
<tr><td>Plaintiffs,</td><td><b>ORDER GRANTING PLAINTIFFS'<br>MOTION FOR PRELIMINARY<br>INJUNCTION</b></td></tr>
<tr><td>v.</td><td></td></tr>
</table>

LIFESPACE COMMUNITIES, INC., *d/b/a*
Friendship Village of Bloomington,

Defendant.

Edward P. Sheu, **BEST & FLANAGAN LLP**, 60 South Sixth Street, Suite 2700, Minneapolis, MN 55402, for Plaintiff Marlene Bixby.

Adam G. Chandler, **BRIGGS & MORGAN, P.A.**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Plaintiff Martha Rogers.

Marnie E. Fearon, **GRAY PLANT MOOTY**, 80 South Eighth Street, Suite 500, Minneapolis, MN 55402, for Plaintiffs William and Eleanor Nickles.

Thomas F. DeVincke, **MALKERSON GUNN MARTIN LLP**, 220 South Sixth Street, Suite 1900, Minneapolis, MN 55402, for defendant.

Plaintiffs Marlene Bixby, Martha Rogers, and William and Eleanor Nickles (collectively, "Plaintiffs") seek to enjoin a redevelopment that would demolish the townhomes in which they live. Defendant Lifespace Communities, Inc. ("Lifespace"), owns and operates Friendship Village of Bloomington (the "Village"), the residential-

retirement development in which Plaintiffs live.  Lifespace plans to redevelop the Village, and the approved redevelopment plans require demolishing Plaintiffs' homes.

Plaintiffs negotiated with Lifespace to live in their respective townhomes for life. Now, Plaintiffs seek to enjoin Lifespace from terminating its contracts with them, from demolishing or destroying their townhomes, and from taking steps toward any redevelopment affecting their homes, including selling interest in the planned redevelopment by collecting deposits on the new units.  Because the Court will find that Plaintiffs are likely to prevail on the merits of their claims and will suffer irreparable harm absent a preliminary injunction, the Court will grant Plaintiffs' Motion for Preliminary Injunction and enjoin Lifespace.

## BACKGROUND

## I.   FACTUAL BACKGROUND

### A.   The Parties

Lifespace is an Iowa non-profit corporation with its principal place of business in Iowa. (Compl. ¶ 4, Mar. 23, 2018, Docket No. 1.)  Lifespace was the Village's developer and continues to own and operate the Village.  (*Id.*)

Marlene Bixby is an 81-year-old Minnesota resident.  (*Id.* ¶ 1.)  She lives at 8168 Parkview Lane, Bloomington, Minnesota (the "Bixby Property"), which is a townhome in the Village.  (*Id.*)  Bixby and her late husband entered into a Residency Agreement with Lifespace in 2012.  (*Id.* ¶ 11.)  They paid Lifespace an entrance fee of $652,392 and an

initial monthly fee of $4,148.  (*Id.* ¶ 16.)  The Residency Agreement gave them the right to occupy the Bixby Property for their lifetimes, subject only to limited exceptions. (*Id.* ¶ 11.)  The property is and has been Bixby's homestead since 2012. (*Id.*)

Martha Rogers is an 83-year-old Minnesota resident.  (*Id.* ¶ 2.)  She lives at 8174 Parkview Lane, Bloomington, Minnesota (the "Rogers Property"), a townhome in the Village.  (*Id.*)  Rogers and her late husband entered into a similar Residency Agreement with Lifespace in 1998.  (*Id.* ¶ 12.)  They paid Lifespace an entrance fee of $375,000 and an initial monthly fee of $1,344.  (*Id.* ¶ 17.)  The Residency Agreement gave them the right to occupy the Rogers Property for their lifetimes, subject only to limited exceptions.  (*Id.* ¶ 12.)  The property is and has been Rogers's homestead since 1998.  (*Id.*)

William Nickles is 87 years old, and Eleanor Nickles is 81 years old.  (*Id.* ¶ 3.)  The Nickels are married Minnesota residents and live at 8176 Parkview Lane, Bloomington, Minnesota (the "Nickles Property"), a townhome in the Village.  (*Id.*)  The Nickles entered into a Residency Agreement with Lifespace in 2002.  (*Id.* ¶ 13.)  They paid an entrance fee of $394,000 and an initial monthly fee of $2,693.  (*Id.* ¶ 18.)  The Residency Agreement gave them the right to occupy the Nickles Property for their lifetimes, subject only to limited exceptions.  (*Id.* ¶ 13.)  The property is and has been the Nickels' homestead since 2002.  (*Id.*)

## B.     The Residency Agreements

The Residency Agreements between Plaintiffs and Lifespace are titled "Return-of-Capital" agreements.  (Decl. of Marlene H. Bixby ("Bixby Decl.") ¶ 3, Ex. 1 (Bixby

Return-of-Capital Agreement ("BA")), Mar. 26, 2018, Docket No. 8; Decl. of Martha Rogers ("Rogers Decl.") ¶ 3, Ex. A (Rogers Return-of-Capital Agreement ("RA")), Mar. 26, 2018, Docket No. 9; Decl. of Eleanor Nickles ("Nickles Decl.") ¶ 5, Ex. A (Nickles Return-of-Capital Agreement ("NA")), Mar. 26, 2018, Docket No. 10.) The Residency Agreements refer to the Plaintiffs as "Residents" and to Lifespace as the "Sponsor." (BA at 6; RA at 2; NA at 6.) Each Residency Agreement requires the Sponsor "to make available to Resident, for as long as Resident lives and subject to the terms of this Agreement, a living unit in the Village described as follows: [description of each Plaintiff's townhome], and to provide, for the Resident's lifetime, the services, utilities and furnishings described . . . below." (BA at 6; RA at 2; NA at 6)

### 1.     Fees

The Residency Agreements lay out various costs, including an "entrance fee," paid by Plaintiffs "[i]n order to reside at the Village for life and to receive the services described above." (BA at 7; RA at 3; NA at 7.) The entrance fees were determined by the location and type of unit selected by each Plaintiff. (Compl. ¶ 19.) Plaintiffs' townhomes are stand-alone buildings comprised of two units with an attached two-car garage, two bedrooms, a large sunporch, and a walk-out to a grassy space and pond. (*Id.*) Each unit has more than 1,640 square feet of living space. (*Id.*) The Residency Agreements also set forth monthly fees to be paid by each Plaintiff and note that the fee may be increased "if [Lifespace], in its sole discretion, deems it necessary to meet the financial needs of the Village and to provide the services to the residents." (BA at 8; RA 3; NA at 8.)

## 2.   Nature of the Rights

The Residency Agreements state that "Resident may reside in the Living Unit for as long as Resident is capable of meeting the requirements of living unit occupancy or this Agreement is terminated by Resident or [Lifespace]." (BA at 8; NA at 9; *see also* RA at 3 (using similar language).)  However, "Resident is not given exclusive possession of the Living Unit in the Village as against [Lifespace]" and each Residency Agreement "is not a lease or easement and does not transfer or grant to Resident any interest in real property owned by [Lifespace]." (BA at 8; RA at 3; NA at 9)  The Bixby and Nickles Agreements also require the Residents "to make application for and receive homestead classification for the Living Unit." (BA at 8; NA at 9.)

## 3.   Termination

The Residency Agreements can be terminated by Residents after they move in for any reason with 120 days' written notice.  (BA at 13; RA at 5; NA at 14.)  Lifespace may only terminate the Residency Agreements "for just cause," which is defined differently in each Residency Agreement but generally includes failure to pay associated fees, concerns regarding Resident's physical or mental health, disturbance, or violation of operating procedures.  (BA at 14-15; RA at 5-6; NA at 14-15.)  If a Residency Agreement is terminated, the Resident will be reimbursed 90% of the entrance fee.  (BA at 15; RA at 6; NA at 16.)

## C.     Events Leading to the Present Action

In November 2017, Lifespace notified Plaintiffs that it was planning a redevelopment of the Village grounds that involved a complete demolition of Plaintiffs' homes. (Compl. ¶ 25.) Lifespace presented Plaintiffs with two options: be put on a waitlist for another unit in the Village or move out of the Village. (*Id.*) Lifespace demanded that Plaintiffs make their decision and submit all supporting documentation to Lifespace by May 31, 2018. (*See, e.g.*, Bixby Decl. ¶ 9, Ex. 2 at 2.) Lifespace explained that, in order to move to a different unit in the Village, Plaintiffs would have to sign a settlement and release agreement. (*Id.* at 2-4) If Plaintiffs' preferred unit was not immediately available, their placement on the waitlist for the unit would be determined by the date on which they signed the settlement agreement, with units assigned on a "first come, first served" basis. (*Id.* at 2; Compl. ¶ 29.) Plaintiffs would need to move into a different unit until their preferred unit became available, at which time they would have two days to decide whether they wished to move again. (Compl. ¶ 26.) Lifespace also told Plaintiffs that they would be responsible for paying the difference between the entrance fees they initially paid and the current entrance fee for their new units, as well as the monthly fee associated with the new unit. (*Id.* ¶ 27.)

Lifespace has not identified any breach of the Residency Agreements by Plaintiffs, has not identified any "just cause" for termination, and has not cited any law, rule, or regulation that would allow it to demolish Plaintiffs' homes or relocate Plaintiffs. (*Id.* ¶ 28.) Lifespace admits that it entered into binding legal contracts with the Plaintiffs and

admits that Plaintiffs have met all the requirements of their occupancy and have abided by all the terms of the Residency Agreements. (Answer ¶¶ 22, 41, Apr. 16, 2018, Docket No. 20.) Nevertheless, Lifespace denies that it intends to breach the agreements and denies that it is "forcing" Plaintiffs to move out of their homes. (*Id.* ¶¶ 38, 43.)

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed this action on March 23, 2018. (Compl.) They allege two claims: (1) breach of contract/anticipatory breach of contract, for which they seek specific performance and damages; and (2) declaratory judgment that Lifespace is or will be in material breach of the Residency Agreements. (*Id.* ¶¶ 40-48.)

Plaintiffs also filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Mot. for TRO and Prelim. Inj., Mar. 26, 2018, Docket No. 5.) The Court granted a temporary restraining order, (Order, Apr. 2, 2018, Docket No. 16), and now considers Plaintiffs' request for a preliminary injunction.

## DISCUSSION

## I.   STANDARD OF REVIEW

In deciding whether to grant a preliminary injunction, the Court considers four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of harms between the parties; and (4) the public interest. *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016). The core question is "whether the balance of equities so favors the movant that

justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The burden of establishing the propriety of an injunction is on the movant. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II.    LIKELIHOOD OF SUCCESS ON THE MERITS

The Eight Circuit has recognized that likelihood of success on the merits is the most important factor. *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). This factor does not require the moving party to "'prove a greater than fifty percent likelihood that [it] will prevail on the merits.'" *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase Sys.*, 640 F.2d at 113). In considering whether a movant is likely to prevail on the merits, "a court does not decide whether the movant will ultimately win." *Id.* The claims need only provide a "fair ground for litigation." *Watkins Inc.*, 346 F.3d at 844.

### A.    Breach of Contract

To prevail on a breach of contract claim under Minnesota law, Plaintiffs must prove: (1) formation of a contract; (2) performance of conditions precedent by Plaintiffs; and (3) breach of contract by Lifespace. *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008), *rev. denied* (Minn. Jan. 20, 2009). Anticipatory repudiation "occurs when a promisor renounces a contractual duty before the time for performance has arrived." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 837 (Minn. 2011). Anticipatory repudiation can occur when a party to a contract

- 8 -

"places itself in a position where it cannot perform the contract" or when the party bringing the action knows that the repudiating party does not intend to perform. *Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450-51 (Minn. 1980).   When one party gives notice to the other that it will not perform, "the injured party can elect to sue immediately." *Id.* at 451.

Plaintiffs have shown a strong likelihood of success on the merits of their anticipatory breach of contract claim.   Notably, Lifespace's response did not address the merits of Plaintiffs' claims.   (*See* Def.'s Opp. Mem. at 4, Apr. 20, 2018, Docket No. 24.) But Lifespace admits that it entered into legally binding contracts with Plaintiffs and that Plaintiffs have performed all conditions precedent.   (*See* Answer ¶¶ 22, 41.)   Lifespace denies that it intends to breach the contract, but all of its actions suggest otherwise. Lifespace submitted its redevelopment plan – which requires demolishing Plaintiffs' homes – for approval to the city of Bloomington.   (Compl. ¶ 31.)   Lifespace has begun marketing the redevelopment's new units and plans to take deposits on units in the redevelopment.   (*See* Compl. ¶ 33).   Lifespace also sent letters to all Plaintiffs stating that they must make a decision to relocate or leave the Village by May 31, 2018.[1]   While the letter purportedly gave Plaintiffs "options," none of the options included staying in their homes.   Plaintiffs have made a strong showing that Lifespace does not intend to perform

---

[1] None of the letters sent to Plaintiffs leaves room for doubt as to Lifespace's intentions. Lifespace states that it "had to make the unfortunate and yet necessary decision to remove four (4) town homes (which includes yours)" and that Lifespace will work with residents to create a "relocation plan." (*See, e.g.*, Rogers Decl. ¶ 8, Ex. B ("Rogers Letter") at 1.)   The letter also implies that Plaintiffs will have to be out of their house at least 45 days prior to the start of construction. (*Id.*)

the contract; thus, they have shown a strong likelihood of success on the merits of their breach of contract claim.

At this stage, Plaintiffs have also shown that they may be entitled to specific performance of the contract. Minnesota courts usually grant specific performance in real estate sale contracts because of the "special status accorded to land as distinguished from other forms of property." *Shaughnessy v. Eidsmo*, 23 N.W.2d 362, 368 (Minn. 1946). While Plaintiffs concede that they have no ownership interest in the properties, they argue that they have something akin to a life estate, which would likely entitle them to specific performance. *See Mosloski v. Gamble*, 253 N.W. 378, 380-81 (Minn. 1934). Lifespace has not contested this characterization of Plaintiffs' interest.

Plaintiffs interest appears to resemble an ownership interest or a life estate. Plaintiffs did not contract to live in just any unit in the Village, they contracted to live in a specific unit, defined by a specific address and specific features. Plaintiffs bargained to live in their particular units because of their unique features. The townhomes have been Plaintiffs' primary residences for between six and twenty years, and Plaintiffs are required to apply for homestead classification of their units. Plaintiffs have shown that they may be entitled to specific performance of their contracts.[2]

---

[2] Even if specific performance were not the required outcome in this case, the Court would have discretion to grant it because, "[i]f real property is involved, specific performance is a proper remedy, even if the other remedies would be adequate." *Schumacher v. Ihrke*, 469 N.W.2d 329, 335 (Minn. Ct. App. 1991) (internal citations omitted). A court may grant specific performance even for personal property "whenever the loss by reason of a violation of the contract cannot be correctly estimated in damages" or when specific performance "is indispensable to justice." *Blankenfeld v. Smith*, 188 N.W.2d 872, 873-74 (Minn. 1971) (quoting *N. Tr. Co. v. Markell*, 63

### B.   Declaratory Judgment

Plaintiffs also seek "a declaration that [Lifespace] is or will be in material breach of the Residency Agreements because it has repudiated its obligation to provide Plaintiffs with their specific townhomes for their lifetimes by demanding that they vacate their homes without lawful justification." (Compl. ¶ 48.) As noted above, Plaintiffs have made a strong showing that Lifespace has anticipatorily breached its contract. Thus, Plaintiffs have also demonstrated a strong likelihood of success on their declaratory judgment claim.

### III.   IRREPARABLE HARM

Plaintiffs bear the burden of demonstrating that an injunction is necessary to prevent irreparable harm. *See Baker Elec. Coop., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir. 1994). Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through damages. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Possible or speculative harm is not enough. *Graham Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 924 (D. Minn. 1998). Failure to show irreparable harm is alone sufficient to deny a preliminary injunction. *See Roberts v. Van Buren Pub. Schs.*, 731 F.2d 523, 526 (8th Cir. 1984).

Irreparable harm is the only factor addressed by Lifespace. But Lifespace does not dispute that the harm to Plaintiffs will be irreparable, rather it disputes that such harm is

---

N.W. 735, 735 (1895) (affirming grant of specific performance in relation to contract for sale of stock).

imminent. The Court finds that Plaintiffs have demonstrated that the harm they will suffer

is both irreparable and imminent.

As to irreparability, Plaintiffs have shown that damages may be insufficient to

compensate them for the loss of their homes in light of the unique treatment given to

property under Minnesota law. But irreparable harm is not tied only to loss of their unique

properties in this case. Another court in this district found irreparable harm where the

plaintiffs alleged that eviction from their primary residence would "substantially disrupt[]"

their lives and that their ability to find suitable replacement housing was "questionable."

*Saygnarath v. BNC Mortg., Inc.*, No. 06-3465, 2007 WL 1141495, at *3 (D. Minn. Apr.

17, 2007). The court found that these allegations were sufficient to tip the irreparable harm

factor in plaintiffs' favor simply based on "the adverse effects that flow from eviction,"

even though plaintiffs did not explain their allegations. *Id.* Here, the adverse effects that

would flow from Plaintiffs being forced out of their homes would be substantially greater.

Plaintiffs are elderly, thus the disruption to their lives would be even greater, likely causing

significant emotional, psychological, and even physical harm. Furthermore, it is unlikely

that Plaintiffs would be able to find comparable housing at an affordable price,[3] which

constitutes irreparable harm. *See id.*; *see also Hruby v. Larsen*, No. 05-894, 2005 WL

1540130, at *4 (D. Minn. June 30, 2005) (finding irreparable harm where eviction would

---

[3] Plaintiffs note that Lifespace told the city of Bloomington that "Bloomington is in need of senior housing" and that Lifespace has a waitlist of over 300 people ready to move into their existing campus. (Decl. of Marnie E. Fearon ("Fearon Decl.") ¶ 4, Apr. 26, 2018, Docket No. 27.) These statistics suggest that comparable housing will not be readily available to Plaintiffs if forced to leave their homes.

cause loss of home where plaintiffs lived for more than 15 years and "their ability to find suitable, affordable housing is questionable").

As to immediacy, Lifespace's argument is unavailing. Lifespace cites *Rogers v. Scurr*, which states that "injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights." 676 F.2d 1211, 1214 (8th Cir. 1982) (quoting *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969)).[4] Lifespace asks the Court to view the demolition of Plaintiffs' homes as separate from the remainder of the redevelopment project and as the only threat of irreparable harm. But the demolition of Plaintiffs' homes is merely part of the broader redevelopment plan, all of which impacts Plaintiffs' interest in their homes. Lifespace's plans to collect deposits on the redevelopment units and commence construction on the property are "a presently existing actual threat" to Plaintiffs' rights. *See id.*

---

[4] Lifespace also cites *Hunter v. Anderson*, a case in which another court in this district adopted a recommendation that the plaintiff's motion for a preliminary injunction enjoining her eviction be denied because the plaintiff had not shown that such harm was imminent. R&R, No. 12-2008 (D. Minn. Jan. 16, 2013), *adopted by* Order, No. 12-2008 (D. Minn. Feb. 12, 2013). But, in *Hunter*, the court could not enjoin eviction proceedings because eviction proceedings had not yet commenced, and defendant had taken no action to remove the plaintiff. Here, the Court can enjoin breach of contract – which includes, but is not limited to, demolition of Plaintiffs' homes – because Lifespace has shown that it intends to breach the contract imminently. *Accord Eckart v. Engelking Corp.*, No. A05-2241, 2006 WL 2729301, at *2 (Minn. Ct. App. Sept. 26, 2006) (noting that a Minnesota district court enjoined a defendant from terminating a contract with plaintiff when plaintiff received notice of cancellation of the contract). Plaintiffs may bring their action now because Lifespace has demonstrated a clear intent to repudiate its contracts with Plaintiffs. In fact, a delay in seeking a preliminary injunction would weigh against granting such relief. *See Gomez v. Marketplace Home Mortg. LLC*, No. 12-153, 2012 WL 1517260, at *3 (D. Minn. Apr. 30, 2012).

Lifespace has also notified Plaintiffs that they must make a decision to either terminate their Residency Agreements or sign a settlement agreement to move into a new unit by May 31, 2018. Either option is an immediate invasion of Plaintiffs' rights, which are protected by their contracts. Lifespace's attempts to strong-arm the Plaintiffs into giving up their contractual rights demonstrate that Plaintiffs face more than just a "possibility of a remote future injury." *Id.*

## IV.   BALANCE OF HARMS AND PUBLIC INTEREST

The balance of harms and the public interest weigh in favor of issuing a preliminary injunction. As to balance of harms, Plaintiffs have identified substantial irreparable harms that they will suffer if Lifespace is permitted to proceed with its redevelopment. Lifespace has not addressed this factor, and its request for a bond suggests that any harm would be compensable through monetary damages.

As to public interest, Plaintiffs seek to uphold a contractual agreement. Courts regularly recognize that the public interest is advanced in upholding contractual agreements. *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003); *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 456 (Minn. Ct. App. 2001). Furthermore, if Lifespace proceeds with its redevelopment by taking deposits while the merits of this case are litigated, third-party interests will become implicated. Lifespace has identified no public interest weighing in its favor.

## V.     BOND

Under Federal Rule of Civil Procedure 65, the Court must order Plaintiffs to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court has discretion regarding the amount of bond. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). While courts usually require a bond, there are exceptions, including when the resulting damages from the wrongful injunction have not been shown. *Id.* The party requesting the bond bears the burden of establishing a rational basis for the amount of the proposed bond. *In re President Casinos, Inc.*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007). The Court need not "order a bond to protect a party from economic damages that are speculative." *Id.*

Lifespace requests a bond of $340,000 per month of the injunction based on its "calculation of losses." (Aff. of Jodi Hirsch ¶ 24, Apr. 24, 2018, Docket No. 23.) The Court will not require a bond in this case because Lifespace's proposed bond is speculative for several reasons.

First, Lifespace has not provided a rational basis for why it would lose $340,000 per month of the injunction. Lifespace did not present evidence from which the Court could deduce that the purported losses are reasonably calculated.

Second, Lifespace fails to explain why the bond should accrue throughout the duration of the injunction, as opposed to a bond of a flat amount. The harm alleged is connected to the collection of deposits for the units that will be built during redevelopment.

However, Lifespace will only collect a finite number of deposits because there are a finite number of new units on which Lifespace can take deposits. Lifespace's proposed bond is not rationally related to the collection of deposits because a continually accruing bond does not reflect this reality.

Third, Lifespace has not explained how it will be harmed by a delay in collecting deposits if – as here – the Court enjoins construction. The Court is particularly unpersuaded because the record shows that demand for housing with Lifespace is so high. Lifespace told the City of Bloomington that it had a "waitlist of over 300 folks ready to move into [its] existing campus" and "an additional 300 folks that have put deposits down to move into [the redevelopment]." (Fearon Decl. ¶ 4.) Lifespace has not alleged that the demand for senior housing will decline during the pendency of this case, and the Court has no reason to believe that Lifespace would struggle to fill the new units if construction were ultimately allowed to go forward. In sum, the Court will not order a bond to protect Lifespace from these speculative economic damages.

The Court also finds that a bond is not necessary in this case because Plaintiffs have demonstrated a high likelihood of success on the merits, and Lifespace has not contested the strength of Plaintiffs' case. Numerous courts have found that a bond is unnecessary when plaintiffs make such a strong showing on the merits. *See, e.g., Perfetti Van Melle USA, Inc. v. Midwest Processing, LLC,* 135 F. Supp. 3d 1015, 1021 (D.S.D. 2015); *TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1232-35 (M.D. Fla. 2013); *IHOP Franchising, LLC v. Tabel*, No. 13-2641, 2014 WL 1767199, at *13 n.52 (D. Kan.

Apr. 15, 2014) (collecting cases), *R&R adopted*, No. 13-2641, 2014 WL 1767191 (D. Kan. Apr. 30, 2014). Lifespace appears to have no right to terminate its contracts; thus, enjoining Lifespace from moving forward with the redevelopment is unlikely to cause the company legitimate money damages.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction [Docket No. 5] is **GRANTED** as follows:

1.     Until further order of this Court, a preliminary injunction is hereby entered against Defendant Lifespace Communities, Inc.

2.     Defendant Lifespace and anyone in active concert or participation with Lifespace shall be temporarily **ENJOINED** from:

a.     Terminating the Residency Agreements that were entered into by each Plaintiff and Defendant;

b.     Demolishing or destroying Plaintiffs' homes in whole or in part;

c.     Commencing or continuing any construction for the proposed redevelopment;

d.     Selling, agreeing to sell, or promising to sell any part or interest in a development or redevelopment affecting Plaintiffs' respective homes.

3.     At this time, a bond is **NOT** required pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

**IT IS ALSO HEREBY ORDERED** that this matter be referred to the Honorable Katherine M. Menendez, United States Magistrate Judge, for a settlement conference. The parties are directed to contact Magistrate Judge Menendez's chambers to schedule a settlement conference.

DATED:  July 2, 2018
at Minneapolis, Minnesota.

                                   s/John R. Tunheim
                              _____
                                  JOHN R. TUNHEIM
                                     Chief Judge
                              United States District Court